IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **In re:** | : | **Chapter 11** |
| | : | |
| **DIGITALSPEED COMMUNICATIONS, INC.,** | : | **Case No. 25-10500 (AMC)** |
| | : | |
| Debtor. | : | |
| | : | |

**DECLARATION OF ADAM H. PASTERNACK IN SUPPORT OF
CHAPTER 11 PETITION AND FIRST DAY MOTIONS**

I, Adam H. Pasternack, declare under penalty of perjury:

1. I am the founder, President, director and sole shareholder of DigitalSpeed Communications, Inc. (the "Debtor" or "DSC"), a Pennsylvania corporation, a debtor and debtor-in-possession in the above-captioned Chapter 11 case. In this capacity, I am generally familiar with the Debtor's day-to-day operations, organization, financial affairs, and books and records.

2. On February 6, 2025 (the "Petition Date"), the Debtor filed a voluntary bankruptcy petition with the United States Bankruptcy Court for the Eastern District of Pennsylvania under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 et. seq. (the "Bankruptcy Code").

3. The Debtor is operating its business and managing its property as a debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

4. Except as otherwise indicated, all facts set forth herein are based upon my personal knowledge of the Debtor's operations and finances, information learned from my review of relevant documents, and information supplied to me by other members of the Debtor's management and employees, and the Debtor's advisors. I am authorized to submit this Declaration on behalf of the Debtor and, if called upon to testify, I would testify competently to the facts set forth herein.

5. I submit this Declaration (a) to provide an overview of the Debtor and this chapter

11 case and (b) in support of the Debtor's chapter 11 petition and "first day" motions (each, a "First Day Motion" and collectively, the "First Day Motions") and the relief requested in the proposed orders therein, which have been filed to minimize the adverse effects of filing for chapter 11 protection and to enhance the Debtor's ability to maximize the value of its estate.

## BACKGROUND

**A.    The Debtor's Business**

Background

6.    DSC is a corporation what was formed on April 1, 2003 under the laws of the Commonwealth of Pennsylvania.

7.    DSC is a telecommunications service provider/carrier/utility that is registered, regulated and compliant with the Federal Communications Commission and other government agencies. DSC provides services to direct customers and resellers, including private-label resellers that market DSC's services under their name/brand to their end-user customers.

8.    Since on or about 2008, in order to provide these services, DSC licensed various fax/billing software (the "License") from Innovative Communications, Inc. ("ICI"), a related entity. DSC allows its customers, including Slingshot Technologies Corporation ("Slingshot"), to use the License to service their customers.

9.    In addition to the License, ICI also provides DSC with (a) management services, (b) administrative support services, (c) customer and client billing, payment processing and collection services, support and related functions, (d) human resources services, (e) management and maintenance of information technology services, (f) accounting support services, (g) insurance management services, and (h) other agreed services, all of which are integral to DSC's operations and the services that DSC provides to its underlying customers. Notwithstanding that ICI provided

2

the aforementioned services to DSC over the last 15 plus years, these terms were memorialized pursuant to an Administrative Services Agreement between the parties, effective January 1, 2025 (the "ASA Agreement").

10. Slingshot was DSC's largest customer until DSC and Slingshot entered into the Merger Agreement (as defined below). Effective as of February 4, 2025, these two entities merged with DSC being the surviving entity. Prior to their merger, DSC received revenue from Slingshot for its services provided to Slingshot.

11. Prior to the merger, Slingshot was a Pennsylvania corporation that incorporated on February 1, 1996. I was also the President, director and sole shareholder of Slingshot.

12. Slingshot provided, now DSC provides, telecommunications and fax services that service direct customers and resellers. These services include, but are not limited to, inbound and outbound APIs, Fax-to-Email, Email-to-Fax, Print-to-Fax and customized services and features.

**The Merger**.

13. On February 3, 2025, DSC (as the *Surviving Entity*) entered into an Agreement and Plan of Merger ("Plan of Merger") with Slingshot (as the *Merged Entity*).

14. Effective as of February 4, 2025 (the "Effective Date"), Slingshot was merged with and into DSC. Since the Effective Date, DSC has continued to use the name "DigitalSpeed Communications, Inc." and, at times, also does business, as "Slingshot Technologies."

15. After the Effective Date, the separate existence of Slingshot ceased, and Slingshot is deemed for any and all purposes to be merged with and into DSC.

16. As set forth in the Plan of Merger, DSC, *inter alia,* possesses all of the rights, privileges, contracts, powers and franchises of a public and private nature of Slingshot, and all property, whether real, personal or mixed, and all debts due to Slingshot on whatever account shall

3

be vested in DSC, and all property rights, privileges, powers and franchises, and all and every other interest of Slingshot shall thereafter effectively be the property of DSC as they were of Slingshot, and DSC has agreed to be deemed for any and all purposes to assume all of the liabilities and obligations of Slingshot.

17. As set forth in the Plan of Merger, the officers of Slingshot serving on the Effective Date, if any, shall be and become the officers of DSC from and after the Effective Date, until their successors shall be duly qualified and elected.

18. Also, as set forth in the Plan of Merger, from and after the Effective Date, the Articles of Incorporation of DSC shall be and remain the Articles of Incorporation of the surviving constituent entity until it is amended by appropriate action of the shareholders of the surviving constituent entity, if necessary and appropriate.

19. The Debtor's principal place of business is located at 100 Front Street, Suite 220, West Conshohocken, PA 19428.

**B.    The Debtor's Corporate Structure**

20. The Debtor has no secured indebtedness.

21. In the ordinary course of business, the Debtor incurred unsecured indebtedness to various trade vendors, and service providers, among others. The Debtor has also incurred substantial legal fees defending a prepetition lawsuit filed in 2014 in the Massachusetts Superior Court, Middlesex County (the "*Prism Group Litigation*" (as described below)) and faces a judgment awarded in said lawsuit, as set forth in greater detail below.

22. The value of the Debtor's assets are approximately $1,335,844 and consist of cash $223,000, accounts receivable $831,065, and equipment with a book value of $281,779.

23. The Debtor's unsecured claims total approximately $9,261,885 consisting of unsecured trade creditor indebtedness of approximately $559,260, a disputed unsecured priority tax indebtedness of approximately $347,256.44, and a judgment entered against the Debtor and in favor of Prism Group, Inc. in the amount of $4,106,289.54 for damages, $280.00 for statutory costs, plus prejudgment interest of $4,248,798.32. For the reasons set forth below, the Debtor disputes the amount of the prejudgment interest of $4,248,798.32.

C.   **Circumstances Giving Rise to this Bankruptcy Case**

**The Prism Group Litigation**

24. On April 22, 2014, litigation was initiated in the Massachusetts Superior Court, Middlesex County (the "Trial Court"), styled *Nicholas Z. Baran v. Adam Pasternack and Slingshot Technologies Corporation, et al.*, Case No. 1481-cv-04291, by Nicholas Baran in his individual capacity when he filed a complaint against Adam Pasternack in his individual capacity and Slingshot (the "Complaint") for the alleged breach of a 2004 contract that had been entered into between Prism Group, Inc. ("Prism") and a customer of Slingshot, Rocket Messaging, Inc. ("Rocket").

25. Given that the Complaint sought to assert a breach of contract claim based upon a contract to which neither the plaintiff nor either defendant was a party, the original defendants moved to dismiss the Complaint. On September 5, 2014, the Trial Court allowed the motion to dismiss as to Mr. Pasternack, but granted leave for an amended complaint to be filed consistent with the discussion in its opinion.

26. On September 25, 2014, Prism proceeded to file an amended complaint as the sole plaintiff styled *Prism Group, Inc. v. Slingshot Technologies Corportation [sic] et al.*, Case No. 1481-cv-04291 (the "Amended Complaint"). By its Amended Complaint, Prism named Slingshot

5

and Rocket as defendants (together, the "Defendants"), again seeking commissions allegedly due under the 2004 agreement between Prism and Rocket. Prism claimed that Slingshot was liable under a contract to which it was not a party because of either successor liability or the alter ego doctrine. The Amended Complaint also included claims for violation of Massachusetts General Laws c. 93A, *quantum meruit* and breach of the implied covenant of good faith and fair dealing.

27. Prior to trial, Prism's claims were narrowed significantly as the result of three successful motions for partial summary judgment filed by Defendants. The first motion eliminated Prism's pre-April 2008 claims, which were time barred. The second motion eliminated Prism's claims related to five Rocket customers named in the Amended Complaint as to whom Prism failed to ever adduce any evidence that it was not paid in full. The third successful motion for summary judgment eliminated Prism's claim against Slingshot based on successor liability.

28. The central claim that proceeded to a bench trial before the Trial Court (Honorable Kenneth J. Fishman presiding) in August 2017 was Prism's claim that Rocket had breached the 2004 contract with Prism and that Slingshot was liable for Rocket's breach because it was Rocket's alter ego. *After* the trial had concluded, Prism sought leave to add two new breach of contract claims, alleging for the first time a direct contractual liability on Slingshot's part with respect to commissions for two Slingshot customers, Curaspan and eClinical. Prism attached to its motion a proposed second amended complaint including those claims (the "Second Amended Complaint").

29. On February 8, 2018, the Trial Court (Judge Fishman still presiding) allowed Prism leave to file its Second Amended Complaint, styled *Prism Group, Inc. v. Slingshot Technologies Corportation [sic] et al.*, Case No. 1481-cv-04291, while simultaneously issuing a decision finding in the Defendants' favor on the merits of the claims from the Amended Complaint that had proceeded to trial, including Prism's theory of liability under the alter ego doctrine against

6

Slingshot. Without allowing Defendants the opportunity to plead or otherwise move in response to the Second Amended Complaint, take discovery concerning the newly-added claims or present a defense in light of those claims at trial, the Trial Court immediately entered judgment in Prism's favor on the newly-added claims.

30. Slingshot timely filed a notice of appeal as to the Trial Court's rulings against it while Prism did not pursue an appeal from the loss of the claims it pled in the Amended Complaint. On April 23, 2020, a unanimous panel of the Massachusetts Appeals Court (the "Appeals Court") held that the Trial Court abused its discretion by not allowing Slingshot the opportunity to obtain and present evidence in its defense to Prism's newly-pleaded claims for breaches of the Curaspan and eClinical agreements. Accordingly, it vacated the judgment against Slingshot. Prism filed an application for reconsideration with the Appeals Court and for a petition for further appellate review with the Massachusetts Supreme Judicial Court, both of which were denied.

31. Following remand, Slingshot filed an Answer to the Second Amended Complaint and the parties engaged in additional written discovery, conducted third-party discovery and took additional depositions, including a deposition of Nicholas Baran, Prism's sole shareholder, on August 5, 2021.

32. Prism also took the novel position that *Slingshot's* successful appeal following the trial before Judge Fishman had the legal effect of resurrecting all of *Prism's* unsuccessful claims, necessitating additional motion practice and ultimately resulting in the Trial Court granting the Defendants' motion for summary judgment as to the claims asserted in the first trial on *res judicata* grounds on October 28, 2021. Prism later moved to reconsider that decision, but its motion for reconsideration was denied as well.

7

33. In addition, even though the Appeals Court had vacated the judgment entered by Judge Fishman, Prism nevertheless moved in advance of the second trial for the Trial Court to ignore the Appeals Court decision and reinstate and "affirm" Judge Fishman's original judgment. The Trial Court denied Prism's motion on April 13, 2022.

34. The matter then proceeded to a second bench trial before the Trial Court (this time with the Honorable Joshua Wall presiding) beginning on April 25, 2022. Following trial, on November 30, 2022, Judge Wall entered judgment in favor of Prism on its direct contractual claims against Slingshot in the amount of $4,106,289.54 based on finding breaches of two contracts: Curaspan (in May 2009) and eClinical (in August 2013), plus interest and costs.

35. After Judge Wall denied Slingshot's motions for post-trial relief, and despite the Trial Court's very clear intention to enter judgment for these commission payments that became due each month over these many years, the Clerk of the Trial Court assumed that interest for commissions that accrued during 2009 through 2022 **were _all_ due on April 22, 2014 when the case was filed** and, based on that assumption, filed on December 1, 2022, an Amended Judgment and Finding of the Court, docket no. 1481-cv-04291, in favor of Prism Group, Inc. and against Slingshot Technologies Corporation adding $4,248,798.32 of interest on top of the $4,106,289.54 of damages awarded by the Trial Court, and statutory costs of $280.00 for a total judgment of $8,355,367.86.

36. Interest, of course, can never be due for payment obligations *before* they arise, but the Clerk erroneously computed *all* amounts that the Trial Court awarded for the 2014 through 2022 period as if they were due in April 2014 when this lawsuit was first filed. That error resulted in the Clerk calculating that **$4,248,798.32 of prejudgment interest** was due when the correct amount of interest is less than half that - $1,671,117.15. The Clerk's error thus overstated the

8

interest due by $2,577,681.17. *See* ¶41 below detailing Slingshot's Motion to Correct Mathematical Errors in Judgment filed in the Trial Court.

37. On December 7, 2022, Slingshot filed a timely appeal, but the Appeals Court affirmed the judgment on October 9, 2024. On December 13, 2024, the Massachusetts Supreme Judicial Court denied Slingshot's Application for Further Appellate Review.

38. The Massachusetts statute governing prejudgment interest in contract actions is Mass. Gen. L. c. 231 sec. 6C. It directs the clerk to add to the amount of damages interest "at the rate of twelve per cent per annum from the date of the breach." However, in this case, as set forth above, the Clerk erroneously added the full amount of interest on the judgment amount from the date of inception of the case (April 22, 2014).

39. Settlement negotiations between Slingshot and Prism were unsuccessful.

40. On January 31, 2025, Prism's counsel requested the Clerk of the Superior Court of Middlesex County to issue execution in the Prism Group Litigation, *Prism Group, Inc. v. Slingshot Technologies Corporation*, Docket No. 1481-cv-04291.

41. On February 4, 2025, Slingshot filed a Motion to Correct Mathematical Errors in Judgment in the Trial Court to correct the errors made by the Clerk in calculating prejudgment interest on the judgment amount as set forth above.

42. The culmination of the above events caused the Debtor to seek protection under Chapter 11 in order to afford the Debtor the opportunity to reorganize its affairs and propose a plan of reorganization.

## SUMMARY OF FIRST DAY MOTIONS

43. To minimize the adverse effects of the commencement of this case, the Debtor has requested a variety of relief in the First Day Motions filed concurrently herewith. I am familiar

9

with the contents of each of the First Day Motions and, to the best of my knowledge, information, and belief, the facts set forth therein are true and correct. I believe that the relief sought therein is necessary to permit an effective transition into chapter 11. A description of the relief requested in and the facts supporting each of the First Day Motions is set forth below.

**FIRST DAY MOTIONS**

A. **Motion of Debtor for an Order (A) Authorizing the Debtor to Pay Certain Prepetition (I) Wages, Salaries, and Other Compensation and (II) Reimbursable Employee Expenses; (B) Confirming that the Debtor may Continue Prepetition Employee Programs in the Ordinary Course of Business; and (C) Directing Banks and Other Financial Institutions to Honor all Related Checks and Electronic Payment Requests**

44. As of the Petition Date, the Debtor employed two (2) employees (the "Employees").

45. To minimize the personal hardship that the Employees would suffer if prepetition wages and are not paid when due or as expected, and to maintain morale and stability in the Debtor's workforce during this critical time, by this Motion, the Debtor seeks authority to pay and honor, in its sole discretion, certain prepetition claims for, wages, salaries and other compensation, expense reimbursement, federal and state withholding taxes, and other amounts withheld (including garnishments), holidays, vacation and all other benefits that the Debtor has historically provided in the ordinary course of business and to pay all costs incident to the foregoing.

46. The Debtor will not pay any prepetition wage claims over the priority limit of 11 U.S.C. § 507(a)(4), presently $15,150.00.

B. **Motion of Debtor for Entry of an Order Providing Utility Companies with Adequate Assurance of Payment Pursuant to 11 U.S.C. § 366**

47. In connection with the operation of its business, the Debtor obtains telecommunication services provided by a number of telecommunication utility companies.

10

48. Preserving utility services on an uninterrupted basis is essential to the Debtor's ongoing operations and, therefore, to the success of its reorganization. Indeed, any interruption of utility services, even for a brief period of time, would disrupt the Debtor's operations. Such a result could seriously jeopardize the Debtor's reorganization efforts and, ultimately, its enterprise value and creditor recoveries. It is, therefore, critical that utility services continue uninterrupted during this chapter 11 case.

D. **Motion of Debtor for an Order Authorizing and Approving Maintenance and Use of Existing Bank Accounts; Use of Existing Books, Records, and Business Forms**

49. By this Motion, the Debtor seeks entry of an order authorizing the Debtor to maintain and use its existing bank accounts, in the name of "*DigitalSpeed*" and "*Slingshot,*" at Wells Fargo Bank, N.A. as well as its existing books, records, and business forms.

50. The use of the existing accounts at Wells Fargo Bank, N.A. are essential to maintaining the Debtor's operations during this case and, therefore, to maximize the value of the Debtor's estate.

51. The Debtor uses the bank accounts to collect ACH payments from its customers and pay vendors, manage and support business operations, and pay its payroll.

**[SIGNATURE PAGE TO FOLLOW]**

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 6th day of February, 2025.

_____
Adam H. Pasternack